IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIOMED, INC.,

         Plaintiff,

v.

TOTAL VEIN SOLUTIONS, LLC,

         Defendant.

CIVIL ACTION NO. 04-CV-10686 NMG

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

Dated: June 6, 2007

Michael A. Albert
Michael N. Rader
John L. Strand
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8000

COUNSEL FOR
PLAINTIFF DIOMED, INC.

# **TABLE OF CONTENTS**

I.  FACTUAL BACKGROUND ..................................................................................................3

    A.  The Diomed Patent and Related Litigation................................................3

    B.  Total Vein Solutions (TVS) ......................................................................3

II.  ARGUMENT ...................................................................................................................6

    A.  Diomed Has Proven a Reasonable Likelihood of Success on the Merits ...............6

        1.  Direct Infringement of Claim 9 by TVS's Customers ................................6

        2.  Indirect Infringement by TVS...................................................................8

            a.  Contributory Infringement ........................................................8

            b.  Inducement of Infringement .......................................................10

        3.  Claim 9 is Valid .......................................................................................12

    B.  Diomed Will Suffer Irreparable Harm Unless
        The Court Enters a Preliminary Injunction...........................................................15

        1.  Price Erosion and Loss of Market Share....................................................16

        2.  Loss of Goodwill and Encouraging Would-Be Infringers.........................17

        3.  Presumption of Irreparable Harm ..............................................................18

    C.  The Balance of Hardships Weighs Heavily in Diomed's Favor............................19

    D.  The Public Interest Favors the Grant of a Preliminary Injunction.........................20

III.  CONCLUSION...............................................................................................................20

Diomed has succeeded in holding AngioDynamics, Inc. ("AngioDynamics") and Vascular Solutions, Inc. ("VSI") liable for their sale of products used to practice Diomed's patented varicose vein treatment method, but now Total Vein Solutions ("TVS")[1] is capitalizing on the verdict, aggressively capturing the AngioDynamics and VSI market share by selling the same products, to the same customers, that the jury in the earlier case found to infringe.

Indeed, TVS is offering special post-verdict promotions designed to target these customers and sell them materials for use in infringing procedures – even including the traditional laser fibers that AngioDynamics and VSI have now stopped selling. These aggressive post-verdict efforts market and sell clearly infringing products, coupled with TVS's recent growth from a small company into a major competitor, as well as its erosion of Diomed's profits by charging lower and lower prices, make it imperative that Diomed now secure preliminary injunctive relief against TVS.[2]

While irreparably harming Diomed by taking significant market share and eroding prices, TVS has done everything in its power to delay Diomed's ultimate relief, stonewalling this case at every turn. TVS even forced Diomed to file a motion to compel basic discovery (D.I. 34) – depositions and documents that TVS <u>agrees</u> Diomed is entitled to. (D.I. 39 at 7; D.I. 46 at 9).[3]

---

[1] According to recent company literature, TVS now calls itself "Total Vein Systems."

[2] Diomed did not originally seek a preliminary injunction because TVS started as a relatively small player in the industry, posing far less of a threat than AngioDynamics and VSI. (Wylie Decl. ¶¶ 3-4). Having succeeded against these larger companies first, Diomed now properly seeks preliminary injunctive relief against TVS. <u>Pfizer, Inc. v. Teva Pharms., USA, Inc.</u>, 429 F.3d 1364, 1381 (Fed. Cir. 2005) (affirming preliminary injunction: "A patentee does not have to sue all infringers at once. Picking off one infringer at a time is not inconsistent with being irreparably harmed. Neither is first targeting infringers whose sales dwarf the sales of other infringers."); <u>Amicus, Inc. v. Post-Tension of Tex., Inc.</u>, 686 F. Supp. 583, 589 (S.D. Tex. 1987) (approving "the filing of a motion for a preliminary injunction after an adjudication in a different case which establishes a reasonable likelihood of success on the issue of infringement").

[3] The motion to compel is set for hearing on June 7 before Magistrate Judge Alexander.

TVS has urged the Court to stay this case and let the case against AngioDynamics and VSI proceed to verdict first, on the theory that a win by the defendants in that case would bind Diomed. (D.I. 39 at 7). Now that Diomed has prevailed in that case, however, TVS is arguing that Diomed should be forced to prevail against <u>two other infringers</u> before this case moves forward. (D.I. 46 at 6). TVS's argument is of course circular. The fact that a patentee has sued multiple infringers does not entitle one infringer to unilaterally appoint itself the last in line, such that its case should be stayed pending resolution of all the others. If that were permitted, all the infringers would take this same tack, and Diomed would be unable to prosecute any of the cases.

Here, Diomed has already proven the validity and enforceability of U.S. Patent No. 6,398,777 ("the '777 patent") on summary judgment, <u>Diomed, Inc. v. AngioDynamics, Inc.</u>, 450 F. Supp. 2d 130, 138-48 (D. Mass. 2006), and has won a jury trial establishing that use of the same products that TVS sells directly infringes the '777 patent.

Accordingly, Diomed is not only likely, but virtually certain, to prevail on the merits in this action. As TVS itself admits (D.I. 39 at 1, 5-6), the direct infringement issue in this case is essentially identical to that presented in the case that Diomed already won. The indirect infringement question cuts even more strongly in Diomed's favor this time around, as TVS continues to sell products like those that the jury found to infringe. To the extent that TVS raises invalidity defenses, they merely rehash the prior art that this Court already considered and rejected in granting Diomed's motion for summary judgment in the previous case.

As already noted, TVS's sales are also causing Diomed irreparable harm. By charging rock-bottom prices in an effort to win over previous AngioDynamics and VSI customers, TVS is taking market share that clearly belongs to Diomed and eroding the amount that customers are willing to pay for products to practice the patented procedure. Diomed's reputation and relationships with customers are also imperiled as a result of the disparity in pricing.

- 2 -

## I.    FACTS

### A.    The Diomed Patent and Related Litigation

Diomed owns the '777 patent, which covers minimally invasive laser treatment of varicose veins. Since its commercial introduction by Diomed in 2002, intraluminal (also called endovenous) laser vein ablation ("ILA") has become the standard of care, drawing acclaim from physicians and patients alike. Diomed's success has prompted other companies to enter the market with competing products for use in the patented procedure. To protect its investment, Diomed sued these companies for patent infringement.

Diomed initially focused its limited resources on the litigation against AngioDynamics and VSI – the two largest infringers in the market. See Decl. of James Wylie ¶¶ 3-4. Diomed succeeded. In August 2006, this Court granted summary judgment that the '777 patent is both valid and enforceable. Diomed, 450 F. Supp. 2d at 138. In a March 2007 trial, a jury found AngioDynamics and VSI liable for contributory infringement and inducement of infringement. At a hearing on May 22, 2007, this Court indicated that it would shortly grant Diomed's motion for a permanent injunction to preclude AngioDynamics and VSI from continuing to sell products that physicians use to infringe the '777 patent. (Case No. 04-CV-10019, D.I. 275).

### B.    Total Vein Solutions (TVS)

Much like AngioDynamics and VSI, TVS offers products specially designed, packaged, and marketed for use in ILA, including laser fibers, vein access devices, "procedure packs," and various accessories. (Wylie Decl. ¶ 5 & Exs. C-E). TVS was founded by David Centanni for the purpose of selling ILA supplies. See Centanni Depo. (Steenburg Decl. Ex. A) at 91. Centanni secured his first customers by contacting physicians who he knew (from his experience working at Dornier, a supplier of laser consoles similar to those sold by AngioDynamics and VSI) were already doing ILA procedures. (Id. at 31-41, 48-49, 54).

TVS grew the business by offering venous surgery packs to physicians who had purchased lasers. (Steenburg Decl. Ex. B at TVS 1734). TVS pursued additional customers through print advertising and direct mail campaigns. (Centanni Depo. at 47). These promotions specifically targeted the ILA market. For example, TVS marketed laser fibers as being "compatible with" or "for use with" the Diomed and AngioDynamics lasers. (Steenburg Decl. Ex. C; Ex. D at TVS 1533; Ex. E).[4]

TVS catalogs likewise highlight particular products "for endovenous procedure with laser." (Steenburg Decl. Ex. G at TVS 931-32). Other promotional materials reference EVLT® (the trademark under which Diomed sells its ILA products) and ELVeS (the mark under which AngioDynamics once sold its ILA products). (Steenburg Decl. Ex. H). TVS has even purchased Google and Yahoo "adwords" such that persons searching for Diomed, EVLT®, or "endovenous laser" receive a link to the TVS website. (Steenburg Decl. ¶¶ 10-14 & Exs. I-M).

TVS personnel regularly attend professional meetings and trade shows like those held by the Society of Interventional Radiologists, the American Society of Phlebology, and the International Vein Conference ("IVC") (Centanni Depo. at 194) -- meetings that draw large numbers of doctors who have active ILA practices (Wylie Decl. ¶ 6; Navarro Decl. ¶ 6). TVS explains to attendees that they can use TVS products for the ILA procedure. (Centanni Depo. at 194). Even after the verdict against AngioDynamics and VSI, TVS took a triple booth at the May 2007 IVC conference and aggressively promoted its products for ILA. (Wylie Decl. ¶ 7).

Over time TVS has added product features that it touts as important to the ILA procedure. For example, TVS began to market introducer sheaths with improved visibility under ultrasound (Steenburg Decl. Ex. N at TVS 1661). TVS likewise offers an adapter designed to attach to the

---

[4] AngioDynamics sells its lasers exclusively for use in ILA, as its product manager David Doster admitted during the recent trial. See March 20 Tr. Transcript (Steenburg Decl. Ex. F) at 17.

end of the introducer sheath and "lock the laser fiber in place" to facilitate withdrawal. (Steenburg Decl. Ex. N at TVS 1712). The TVS literature continues to push these products (Wylie Decl. Ex. B) and emphasize doctors' positive reactions to them. (Wylie Decl. Ex. A at 5).

TVS has also provided advice to physicians – including instructional videos – about the administration of tumescent anesthesia during the ILA procedure, a critical step in achieving contact between the fiber tip and the vein wall, as Diomed proved at trial. (Steenburg Decl. Ex. C & Ex. B at TVS01737; Centanni Depo. at 208-213). TVS even sells lidocaine solutions and saline – the essential ingredients of the tumescent fluid itself. (Wylie Decl. Ex. E at 3).

TVS emphasizes to its customers the convenience of purchasing endovenous procedure packs rather than assembling the requisite components individually. (Steenburg Decl. Ex. H; Wylie Decl. Ex. A at 2). Although TVS sells laser fibers, vein access devices and procedure packs separately, it also advertises these items together for one "all inclusive" or "total package" price. (Steenburg Decl. Ex. O; Wylie Decl. Exs. H & I).

TVS's marketing efforts revolve largely around its status as the lowest-priced supplier in the marketplace. (Wylie Decl. ¶ 9). Indeed, TVS invites physicians to "compare our pricing with your present supplier." (Wylie Decl. Ex. H). A recent report prepared by the independent Millennium Group found that TVS is the "most significant generic disposable competitor in the ELA market" and further commented that such companies "have been quite successful in marketing generic laser fiber kits that cost nearly half as much as disposable kits from leading ELA companies." (Steenburg Decl. Ex. P at 68) (emphasis added).

Following the jury verdict against AngioDynamics and VSI, TVS has redoubled its efforts to capture more of the market, further slashing its prices, and stepping up its email and fax campaigns. (Wylie Decl. ¶¶ 7-8 & Exs. F-G). Unless preliminarily enjoined, a company that was not even a party to the March 2007 trial stands to capitalize unfairly on the jury's verdict.

- 5 -

## II.    ARGUMENT

The Court should grant a preliminary injunction because the evidence establishes that Diomed (1) has a reasonable likelihood of success on the merits, (2) faces irreparable harm if the Court does not grant an injunction, (3) has a balance of hardships tipping in its favor, and (4) is proposing an injunction that the public interest favors. Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1370 (Fed. Cir. 2005).  No one factor is dispositive; the Court instead should weigh all of them. E.g., Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1457 (Fed. Cir. 1988) (affirming preliminary injunction even though balance of hardships favored neither party).

### A.    Diomed Has Proven a Reasonable Likelihood of Success on the Merits.

To show a reasonable likelihood of success on the merits, Diomed must demonstrate that it will likely prove that TVS infringes at least one valid and enforceable claim of the '777 patent. Abbott Labs. v. Andrx Pharms., Inc., 473 F.3d 1196, 1201 (Fed. Cir. 2007).  The '777 patent is presumed valid, however, and TVS bears the burden of raising a substantial question of invalidity. Id.; see also Gillette, 405 F.3d at 1370 (preliminary injunction motions are assessed "in light of the presumptions and burdens that will inhere at trial on the merits"); Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetel, 546 U.S. 418 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial.").

### 1.    Direct Infringement of Claim 9 by TVS's Customers.

Claim 9 of the '777 patent covers "[a] method of treating a blood vessel using laser energy, comprising the steps of:

- inserting means for emitting laser energy into the blood vessel at a puncture site, wherein said emitting means has a laser
- placing said laser emitting section of the said emitting means into intraluminal contact with the blood vessel at a treatment site; and
- emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of said blood vessel.

As construed by the Court in the parallel AngioDynamics and VSI case, the "means for emitting laser energy" must be "a fiber optic line with an uncoated tip at its end capable of emitting laser energy." (04-CV-10019, D.I. 55). The Court also interpreted the "placing" limitation to mean "deliberately putting the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel, which requires the drainage of blood and compression of the vein." (Id.). Finally, Court also found the claim to require "maintaining of the tip-interior surface in physical contact with the vessel wall while laser energy is emitted to decrease the diameter of the blood vessel." (Id.).[5]

The jury in the parallel case concluded that doctors necessarily infringe claim 9 when they insert a bare-tipped laser fiber into the vein, inject tumescent anesthesia around the vein, and fire the laser while withdrawing the fiber through the vein. Here, TVS admits that it sells laser fibers used with laser consoles, including those sold by AngioDynamics and VSI. (D.I. 39 at 3). TVS also sells supplies for administering tumescent anesthesia, including the lidocaine and saline needed to prepare the tumescent fluid for injection. (Wylie Ex. C & E).

Diomed will unquestionably establish that doctors using TVS's products directly infringe claim 9 for the same reason the jury found that physicians using AngioDynamics and VSI products do.[6] TVS itself conceded that this case shares "common disputed issues of fact" with Diomed's suits against AngioDynamics and VSI (D.I. 39 at 1) and even acknowledged that the relevant "direct infringement issues" would be addressed during the recent trial. (D.I. 39 at 5-6). The verdict thus establishes that Diomed likely will prevail on that issue against TVS as well.

_____

[5] TVS has adopted the Court's construction in its responses to Diomed's interrogatories. See TVS's Supplemental Responses 6, 12, and 15 (Steenburg Decl. Ex. Q).

[6] Indeed, many of TVS's customers have even received instruction from AngioDynamics and VSI in how to perform the ILA procedure.

### 2.    Indirect Infringement by TVS.

Diomed will establish that TVS indirectly infringes claim 9 of the '777 patent by targeting ILA users and marketing a line of products specially designed and packaged for that procedure. This in fact is how TVS got its start – by contacting physicians whom the founder, a former salesperson for another laser company, knew to be using the ILA technique. (Centanni Depo. at 31-41, 48-49, 54, 91).

#### a.    Contributory Infringement

Diomed will prevail on its contributory infringement claim because it is clear that (1) TVS knew about the '777 patent and the infringing use of its products and (2) those products lack substantial non-infringing uses. Diomed, 450 F. Supp. 2d at 148 ("To prevail on a claim of contributory infringement, the plaintiff must prove direct infringement, that the defendant knew of the patent and of the infringing use of its own product and that the defendant's product lacks a substantial non-infringing use.").

TVS indisputably knew of the '777 patent at least by the time that Diomed filed this suit,[7] yet continues to sell products to ILA users and target the market.

TVS admits that its customers use its products to perform ILA procedures. (Centanni Depo. at 33-46). This is consistent with the business plan of TVS's founder, who indeed could not describe any instances in which several TVS products about which he was questioned were used for anything other than ILA. (Centanni Depo. at 62, 99-100). Today, TVS continues to sell ILA products despite the jury verdict establishing that use of such products directly infringes the '777 patent.

---

[7] TVS also admits that its founder was previously aware "that Diomed owned a patent in the field of endovenous laser surgery" due to his earlier work at Dornier, a competitor of Diomed (Ex. D to D.I. 39), but has stonewalled further discovery on this point.

As packaged and marketed, TVS's procedure packs lack any substantial non-infringing use. When assessing whether an item comprising a number of different components or ingredients falls within this "staple" exception to contributory infringement, courts look to the marketed product as a whole. Hodosh v. Block Drug Co., 833 F.2d 1575, 1578-79 (Fed. Cir. 1987). See also Oxford Gene Tech. Ltd. v. Mergen Ltd, 345 F. Supp. 2d 444, 464-66 (D. Del. 2004) (as a whole, defendant's medical kit was only suitable for carrying out plaintiff's patented method); Hoffmann-La Roche, Inc. v. Promega Corp., 33 U.S.P.Q.2d 1641, 1648 (N.D. Cal. 1994) (party can be liable for contributory infringement where combination of components makes "the kit, as a whole, unsuitable for substantial noninfringing use").

Here, even most of TVS's so-called "universal" procedure packs contain components that collectively would not beused for any procedure other than ILA. For instance, the vast majority of the packs contain 5 French introducer sheaths, and TVS itself admits that it is not aware of any customers who use such sheaths for any purpose other than ILA. (Centanni Depo. at 99-100). Diomed's inventor Dr. Navarro agrees. (Navarro Decl. ¶¶ 8-13). Sale of these packs is contributory infringement. Mentor H/S, Inc. v. Medical Device Alliance, Inc., 244 F.3d 1365, 1379 (Fed. Cir. 2001) (affirming judgment of contributory infringement because the record did "not indicate any actual uses" of the accused products apart from the claimed method).

Although TVS nominally offers laser fibers and procedure packs separately, it in fact bundles these components together (Steenburg Decl. Ex. O, Wylie Ex. H) – the equivalent of the Diomed, AngioDynamics, and VSI kits.[8] One TVS advertisement even expressly compared the price of a TVS combination to the supposed price of a Diomed kit. (Wylie Decl. Ex. I).

---

[8] TVS has stonewalled Diomed's requests for further information about customer buying practices. See TVS's Response to Diomed's Interrogatory No. 23 (Steenburg Decl. Ex. R).

TVS's suggestion that use of its products according to the CoolTouch protocol might somehow avoid infringement (D.I. 46 at 6) is specious. CoolTouch users infringe Diomed's patent in the same way that AngioDynamics and VSI users do. Indeed, Dr. Robert Weiss – a leading figure in the ILA community and a "spokesperson and/or consultant" for CoolTouch[9] – repeatedly emphasized, at a CoolTouch sales meeting, the importance of tumescent anesthesia for compressing the vein to achieve contact between the vein wall and fiber tip:

- "This is very critical. We must compress the vein so that it gets good contact with the laser fiber." (Steenburg Decl. Ex. T at 26:03).
- "The purposes of the tumescent fluid is [sic] compress the treatment vein to achieve better vein-wall contact." (Id. at 1:06:15).
- "I think good contact with the end of the laser fiber is important because this way you are getting the energy to the vein wall, and the larger the vein is the more it's important to do that." (Id. at 1:26:37).

Later, at a physician training workshop, Dr. Weiss reiterated the importance of tumescent anesthesia for compression and contact. (Steenburg Decl. Ex. U at 9:30, 12:48, 41:59). Displaying a slide noting that one of the purposes of tumescent fluid is to "[c]ompress the treatment vein to achieve better vein wall contact with [the] laser fiber," he emphasized the need to "crush" the vein down. (Steenburg Decl. Ex. V at 27:59).

### b.  <u>Inducement of Infringement</u>

Diomed will establish that TVS induces doctors to infringe because it (1) sells products to those physicians in order to help them perform successful ILA procedures; and (2) knows or should know – at least since the jury verdict – that such activities constitute direct infringement. <u>DSU Med. Corp. v. JMS Co.</u>, 471 F.3d 1293, 1304-06 (Fed. Cir. 2006) (en banc).

---

[9] <u>See</u> CoolTouch's Response to Diomed's Interrogatory No. 8 (Steenburg Decl. Ex. S).

TVS's advertising and marketing efforts exemplify many of the activities that courts have repeatedly held to induce patent infringement. For example, TVS has explicitly referred to Diomed, AngioDynamics, EVLT® and ELVeS in its advertising campaigns (Steenburg Decl. Ex. E, G, H, O) – actively promoting its products as being compatible with those of Diomed and others for use in the (patented) technique. (Centanni Depo. at 82, 233-34). As noted above, TVS even compares for its customers the price of a Diomed kit with the price of the same components purchased through TVS. (Wylie Decl. Ex. I). More recently, TVS has taken this campaign to the Internet, purchasing adwords like "endovenous laser," Diomed, and EVLT® from Google and Yahoo. (Steenburg Decl. ¶¶ 10-14 & Ex. I, J, K, L, M).

Advertisements like those of TVS are classic evidence of inducement. E.g., Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., 145 F.3d 1303, 1311-12 (Fed. Cir. 1998) (affirming summary judgment); NTP, Inc. v. Research in Motion, Ltd., 261 F. Supp. 2d 423, 437 (E.D. Va. 2002) (granting summary judgment: "RIM, by advertising, offering to sell, and selling the BES and BlackBerry Pagers, knowingly and intentionally induced others to infringe the Campana patents."). TVS's customers use its products to perform the patented ILA technique, precisely as TVS intends and encourages. Unsurprisingly, TVS cannot name any customers who purchase laser fibers and use them for any purpose other than ILA. (Centanni Depo. at 62).

TVS has also designed its products in a way that makes ILA particularly convenient, thereby inducing physicians to perform the infringing procedure. Rather than ordering an array of different items individually, doctors can turn to TVS for "one-stop shopping." Oxford Gene Techs., 345 F. Supp. 2d at 464 (noting that the defendant's kits included all of the components required to perform the directly infringing acts). This is a concept that Diomed pioneered (Wylie Decl. ¶ 2); the fact that TVS followed in the patent holder's footsteps is further evidence of inducement. Applera Corp. v. MJ Research Inc., 372 F. Supp. 2d 233, 236 (D. Conn. 2005)

- 11 -

("Copying patented product features demonstrates the purposefulness with which defendants sought to attract PCR users as customers .... Defendants thereby encouraged these customers to use their thermal cyclers in an infringing manner.").

TVS even has offered instructional videos and personalized advice regarding the purpose and administration of tumescent anesthesia. (Steenburg Decl. Ex. B at TVS01737; Ex. C; Centanni Depo. at 208-213). Similar to the instructions and workshops that AngioDynamics and VSI offer, these customer support efforts are additional examples of inducement. Univ. of Cal. v. Hansen, 54 U.S.P.Q.2d 1473, 1479 (E.D. Cal. 1999).

The verdicts against AngioDynamics and VSI, moreover, establish TVS's knowledge that doctors performing ILA practice the method of claim 9 and thus infringe Diomed's patent.[10] Recognizing that the "direct infringement issues" are common to all of the cases (D.I. 39 at 1, 5-6), TVS moved to stay the present action pending the resolution of Diomed's other suits. The jury subsequently returned a verdict in Diomed's favor, yet TVS continues to promote its products for use in ILA (while continuing to stonewall discovery on Diomed's claims). This conduct unambiguously evidences active inducement.

### 3.    Claim 9 is Valid.

TVS will not prove invalidity of claim 9 of the '777 patent by clear and convincing evidence. Patents enjoy a statutory presumption of validity. 35 U.S.C. § 282. This presumption applies throughout litigation, including when the patentee moves for a preliminary injunction. E.g., Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1998). If the accused infringer "fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." Id.

---

[10] TVS is well aware of the verdict. Indeed, its counsel attended most or all of the trial.

This Court previously granted Diomed's motion for summary judgment on the AngioDynamics and VSI invalidity theories. Diomed, 450 F. Supp. 2d at 138-45. Prior adjudications of validity weigh heavily in favor of a finding that the patentee will likely prevail on the merits. E.g., Hybritech, 849 F.2d at 1452; H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 388 (Fed. Cir. 1987) (prior validity finding offers "strong support to the grant of a preliminary injunction."), abrogated on other grounds by Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995).

TVS's invalidity theory, relies largely on prior art already addressed by this Court.[11] The Court held that the Biegeleisen article, the O'Reilly article, the Puglisi paper, the Puglisi video, and the Mazza article do not invalidate claim 9. Diomed, 450 F. Supp. 2d at 141-45.

The Court's earlier analysis also establishes that the additional prior art referenced by TVS does not invalidate claim 9 of the '777 patent either. In particular, "none of the ... references disclosed, expressly or inherently, direct physical contact between the laser apparatus and vein wall." Id. at 145.

U.S. Patent No. 4,564,011 to Goldman[12] specified the use of a laser fiber (15) capped with a lens (16) housed within a "protective conduit" that prevents contact.



(Steenburg Decl. Ex. W).

---

[11] See TVS's Supplemental Response to Diomed's Interrogatory No. 16 (Steenburg Decl. Ex. Q).

[12] Although aware of the reference, AngioDynamics and VSI did not even argue that Goldman invalidated the '777 patent.

Similarly, German Patent No. 31 10 322 to Frank discloses a laser probe (4) with a protective cap (5) that also <u>prevents</u> contact.



(Steenburg Decl. Ex. X).

U.S. Patent No. 5,531,739 to Trelles specified the use of a probe located <u>beneath</u> the vein, rather than a device inserted into the vein in a way designed to make contact with the vein wall. (Steenburg Decl. Ex. Y, Col. 2, lines 61-62).

U.S. Patent No. 5,022,399 to Biegeleisen discloses almost nothing at all about using a laser, and certainly nothing about putting the fiber in direct contact with the vein wall.[13] (Steenburg Decl. Ex. Z). Indeed, it suffers from the same shortcomings as the Biegeleisen article, which this Court already addressed. <u>See</u> 450 F. Supp. 2d at 145 (noting that the Biegeleisen article included only a paragraph of speculation about laser energy and did "not demonstrate physical contact between a fiber optic line and a vessel wall").

In short, the invalidity theories that TVS has articulated promise nothing more than a rehash of the argument that this Court has already rejected in the parallel AngioDynamics and VSI case.

---

[13] Although aware of the Biegeleisen patent, the expert proffered by AngioDynamics and VSI did not even argue that it would invalidate any claim of the '777 patent.

**B.    Diomed Will Suffer Irreparable Harm Unless
       The Court Enters a Preliminary Injunction.**

If this Court does not preliminarily enjoin TVS from further infringement in the wake of

the jury verdict against AngioDynamics and VSI, Diomed will be irreparably harmed by

irreversible price erosion and loss of market share in the ILA market.  TVS is poised to fill the

vacuum left by the verdict and impending injunction against AngioDynamics and VSI by

forming relationships with even more doctors and selling them ILA products priced at levels that

do not begin to reflect the costs of developing and commercializing the technology – expenses

that Diomed incurred by acquiring the rights to the '777 patent. (Wylie Decl. ¶¶ 8-9, 14).  By

targeting previous AngioDynamics and VSI customers, TVS is taking sales that rightfully belong

to Diomed and rendering the jury's verdict a hollow victory for Diomed.  Courts have

specifically held that after obtaining a judgment against one infringer is an appropriate time to

obtain a preliminary injunction against other infringers selling the same products. E.g., Whistler

Corp. v. Dynascan Corp., 9 U.S.P.Q.2d 2087, 2088 (N.D. Ill. 1988); Amicus, Inc. v. Post-

Tension of Tex., Inc., 686 F. Supp. 583, 589 (S.D. Tex. 1987) (approving "the filing of a motion

for a preliminary injunction after an adjudication in a different case which establishes a

reasonable likelihood of success on the issue of infringement").

TVS's sales after the verdict also embolden other companies to target the ILA market

(notwithstanding Diomed's patent rights) while jeopardizing Diomed's relationships with its own

customer base. (Id. ¶¶ 14-16).  In short, entry of a preliminary injunction is necessary to ensure

that TVS and other like-minded companies do not unfairly capitalize on the verdict against

AngioDynamics and VSI, causing irreparable harm to Diomed.  This evidence reinforces the

presumption of irreparable harm to which Diomed is entitled given its strong showing of

likelihood of success on the merits.

### 1.    Price Erosion and Loss of Market Share

For much of its history, TVS has been a small player on the ILA market and had relatively little impact, particularly compared to that of AngioDynamics and VSI. For that reason, Diomed allocated its resources primarily to those other lawsuits. (Wylie Decl. ¶ 4); Pfizer, Inc. v. Teva Pharms., USA, Inc., 429 F.3d 1364, 1381 (Fed. Cir. 2005) (affirming grant of preliminary injunction: "A patentee does not have to sue all infringers at once. Picking off one infringer at a time is not inconsistent with being irreparably harmed. Neither is first targeting infringers whose sales dwarf the sales of other infringers."); Hybritech, 849 F.2d at 1457 (affirming a preliminary injunction even though the patentee delayed in pursuing accused infringer while it litigated against another infringer).

Now, however, TVS is capturing a significant share of the market as a result of its lower pricing – a strategy made possible by the company's minimal overhead or recurring expenses, and failure to pay a royalty (as Diomed does) to the inventors of the medical procedure for which TVS sells its products. For example, TVS currently offers a laser fiber, introducer kit, and access needle for a total price of $131.85 – a fraction of what Diomed charges for comparable products. (Wylie Decl. ¶ 12). A number of TVS customers have informed Diomed salespeople that they selected TVS solely because of the extremely low prices. (Wylie Decl. ¶¶ 12-13).

TVS has intensified these efforts following the verdicts against AngioDynamics and VSI. At the recent IVC conference, for example, TVS distributed a special "IVC Customer Order Form" offering discounts that in some cases exceeded 30 percent. (Wylie Decl. Ex. F). A separate May 2007 promotion offered on a TVS website advertised laser fibers at an effective price of barely $88 per procedure. (Wylie Decl. Ex. G).

In short, Diomed's recent success against AngioDynamics and VSI has enabled TVS to expand its share of the market while continuing to depress the price for ILA-related products. This price erosion and lost market share irreparably harms Diomed. Each TVS sale makes it less likely that Diomed can return the market to its proper state following a final judgment and permanent injunction. (Wylie Decl. ¶ 14). In other words, expecting doctors to return to Diomed months or years down the road and pay a higher price that reflects Diomed's patent licensing costs "is not a reliable business option." Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 975-76 (Fed. Cir. 1996) ("The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by legal fiat."). Price erosion and lost market share are accordingly classic examples of irreparable harm meriting preliminary injunctive relief. E.g., Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1381-82 (Fed. Cir. 2006); Purdue Pharma L.P. v. Boegringer Ingelheum GMBH, 237 F.3d 1359, 1367-68 (Fed. Cir. 2001). This is particularly true for small companies – including Diomed  – that rely on intellectual property to "establish a market position and create business relationships." Hybritech, 849 F.2d at 1456. Rather than licensing the '777 patent to others, Diomed has relied on its rights to build a business of its own and become the ILA market leader. (Wylie Decl. ¶ 15) TVS's opportunistic behavior in the wake of the verdict disrupts those efforts and causes Diomed harm for which money damages alone cannot provide adequate compensation. (Id.). What is more, TVS's ability to pay an ultimate monetary judgment is in serious doubt. This is yet a further reason why a preliminary injunction is needed now, since TVS may not be able to satisfy a later judgment.

### 2.      Loss of Goodwill and Encouraging Would-Be Infringers

TVS's infringement in the wake of the verdict against AngioDynamics and VSI also irreparably harms Diomed because of the message that it sends to customers and other potential competitors – namely, that nothing has changed.

Diomed has attracted and retained customers in part based on the strength of its patent portfolio. Sales representatives have emphasized that Diomed is the <u>only</u> company authorized to sell ILA procedure kits; the message is that Diomed will ultimately have its day in court and shut out infringers. (Wylie Decl. ¶ 16). Now that the AngioDynamics and VSI trial has occurred, however, many ILA users are <u>still</u> paying much lower prices than those that Diomed must charge its customers to recoup the costs of obtaining the '777 patent rights and of developing this groundbreaking technology. (<u>Id.</u>). The injury that this disparity works to Diomed's reputation is another type of irreparable harm that strongly favors preliminary injunctive relief. <u>E.g.</u>, <u>LifeScan, Inc. v. Polymer Tech. In'l Corp.</u>, 35 U.S.P.Q.2d 1225, 1240 (W.D. Wash. 1995).

Moreover, the fact that TVS is rapidly gaining market share – and is poised to do so even further once the Court permanently enjoins AngioDynamics and VSI – sends the message to others[14] that nothing short of trial will stop market entrants from stealing the market position Diomed rightfully enjoys as a result of its patent. This too is the sort of injury that merits a preliminary injunction. <u>E.g.</u>, <u>H.H. Robertson</u>, 820 F.2d at 390 ("The opportunity to practice an invention during the notoriously lengthy course of patent litigation may itself tempt infringers.").

### 3.    <u>Presumption of Irreparable Harm</u>

All of the above evidence is separate and apart from the presumption of irreparable harm to which Diomed is entitled given its strong showing of a likelihood of success on the merits in proving infringement. <u>E.g.</u>, <u>Pfizer</u>, 429 F.3d at 1381; <u>Bell & Howell Document Management Prods. Co. v. Altek Sys.</u>, 132 F.3d 701, 705, 708 (Fed. Cir. 1997) (vacating denial of preliminary injunction and instructing district court to consider the presumption of irreparable harm).

---

[14] The fact that a preliminary injunction against TVS would leave some other players in the market does not change the reality that TVS's sales causes Diomed irreparable harm. <u>Polymer Techs.</u>, 103 F.3d at 975 (vacating denial of PI even though other infringers were still selling).

C.    **The Balance of Hardships Weighs Heavily in Diomed's Favor**.

The injuries that Diomed suffers today and will continue to suffer absent a preliminary

injunction dwarfs the harm that TVS would face as a result of Diomed's requested relief.

As discussed above, Diomed has invested millions of dollars in developing the ILA

market and making the '777 patent the cornerstone of its business.  After spending millions more

in litigation against AngioDynamics and VSI to protect this investment, Diomed now finds TVS

stepping in where the other infringers left off.

TVS, by contrast, elected to enter the market even though founder David Centanni <u>knew</u>

that a patent existed covering endovenous laser treatment. <u>See</u> TVS's Supplemental Response to

Diomed's Interrogatory No. 1 (Steenburg Decl. Ex. Q).  Having taken a "calculated risk" that it

might infringe such claims, TVS cannot be heard to complain regarding the consequences of its

decision. <u>Smith Int'l, Inc., v. Hughes Tool Co.</u>, 718 F.2d 1573, 1581 (Fed. Cir. 1983); <u>see also</u>

<u>Schawbel Corp. v. Conair Corp.</u>, 122 F. Supp. 2d 71, 85 (D. Mass. 2000) ("If a plaintiff will

ultimately prevail at trial, then any harm befalling the defendant is its own doing.").

This indeed would be true even had TVS sunk substantial development costs into its

product line. <u>Ortho Pharm. Corp. v. Smith</u>, 15 U.S.P.Q.2d 1856, 1863 (E.D. Pa. 1990) ("One

who elects to build a business on a product found to infringe cannot be heard to complain if an

injunction against continuing infringement destroys the business so elected.").  In reality,

however, TVS merely imitated Diomed's concept of selling convenient kits and packs for use in

the ILA procedure.  Such copying is itself a reason to grant the preliminary injunction. <u>Saes</u>

<u>Getters, S.p.A. v. Ergenics, Inc.</u>, 816 F. Supp. 979, 987 (D.N.J. 1992).

That TVS is a small company and depends heavily on the sale of ILA products does not

insulate it from injunctive relief. "Small parties have no special right to infringe simply because

they are small." <u>Bell & Howell Document Management Prods.</u>, 132 F.3d at 708.

- 19 -

Diomed too is a small company, drawing the vast majority of its revenue from the sale of ILA products. Schawbel Corp., 122 F. Supp. 2d at 84 (granting preliminary injunction in case where the product at issue accounted for 80-90 percent of the patentee's revenue). Furthermore, the harm to Diomed as a result of TVS's continued presence in the marketplace is plain. TVS, by contrast, can merely speculate what would happen to its business in the event of an injunction. The balance of hardships strongly favors Diomed.[15]

**D.    The Public Interest Favors the Grant of a Preliminary Injunction**

Preliminary injunctions that enforce valid patents against likely infringers further "public policy inherent in the patent laws designed to encourage useful inventions by rewarding the inventor with a limited period of market exclusivity." Pfizer, 429 F.3d at 1382. Any other rule would diminish patent rights and severely undermine the "express purpose of the Constitution and Congress, to promote progress of the useful arts." Smith Int'l, 718 F.2d at 1577-78.

Therefore, the public interest is served by the prompt enforcement of patents unless there is some critical countervailing factor. Diomed's request does not raise any such competing concern. On the contrary, Diomed stands ready and able to fill all of the orders that TVS currently receives. (Wylie Decl. ¶ 17). An injunction against TVS would not jeopardize any doctor's ability to perform the ILA procedure. The fact that physicians would be paying a somewhat higher price to do so does not justify denying Diomed's motion. E.g., Pfizer, 429 F.3d at 1382; Payless Shoesource, Inc. v. Reebok Int'l Ltd., 998 F.2d 985, 991 (Fed. Cir. 1993).

**III.    CONCLUSION**

For the above reasons, the Court should grant Diomed's motion for a preliminary injunction precluding TVS from further infringement of the '777 patent.

---

[15] Moreover, a preliminary injunction would be appropriate even if the balance of hardships favored neither Diomed nor TVS. Hybritech, 849 F.2d at 1457.

Respectfully submitted,

DIOMED, INC.,

By its attorneys,

Dated: June 6, 2007

_____

Michael A. Albert, BBO #558566
malbert@wolfgreenfield.com
Michael N. Rader, BBO #646990
mrader@wolfgreenfield.com
John L. Strand (BBO #654985)
jstrand@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, Massachusetts 02210
Tel: (617) 646-8000
Fax: (617) 646-8646

## CERTIFICATE OF SERVICE

I certify that counsel of record for the defendant will be served by email and first class mail on the date indicated above.

_____