1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4    DIOMED, INC.,                    )
                        Plaintiff,    )
5                                     )
                                      )
6    vs.                              )  CA No. 04-10686-NMG
                                      )
7                                     )
     TOTAL VEIN SOLUTIONS, LLC,       )
8                       Defendant.    )

9


10

11   BEFORE:  THE HONORABLE NATHANIEL M. GORTON

12

13           HEARING ON MOTION TO AMEND THE COMPLAINT

14

15        John Joseph Moakley United States Courthouse
                      Courtroom No. 4
16                    One Courthouse Way
                      Boston, MA 02210
17                Thursday, May 22, 2008
                       2:37 P.M.

18

19                  Cheryl Dahlstrom, RMR
                    Official Court Reporter
20        John Joseph Moakley United States Courthouse
              One Courthouse Way, Room 3209
21                    Boston, MA 02210
              Mechanical Steno - Transcript by Computer

22

23

24

25

 1   APPEARANCES:

 2        WOLF, GREENFIELD & SACKS, P.C.
          By:  Michael A. Albert, Esq.
 3             Michael N. Rader, Esq.
               Charles T. Steenburg, Esq.
 4        600 Atlantic Avenue
          Boston, Massachusetts 02210
 5        On behalf of the Plaintiff.

 6        BURNS & LEVINSON LLP
          By:  Merton E. Thompson, Esq.
 7             Diane A.D. Noel, Esq.
          125 Summer Street
 8        Boston, Massachusetts 02110
          - and -
 9        PATTERSON & SHERIDAN, LLP
          By:  Keith Jaasma, Esq.
10        3040 Post Oak Boulevard
          Suite 1500
11        Houston, Texas 77056
          On Behalf of the Defendant and David Centanni and
12        Tyrell Schiek.

13

14

15

16

17

18

19

20

21

22

23

24

25

3

P R O C E E D I N G S

THE CLERK:  This is Civil Action 04-10686, Diomed,
Inc. vs. Total Vein Solutions.  Will counsel please identify
themselves for the record.

MR. ALBERT:  Good afternoon, your Honor.  Michael
Albert for plaintiff, Diomed, Inc.

THE COURT:  Good afternoon, Mr. Albert.

MR. ALBERT:  With me is Michael Rader and Charles
Steenburg.

THE COURT:  Mr. Rader, Mr. Steenburg, good afternoon
to you.  And for the defendants?

MR. THOMPSON:  Good afternoon, Judge Gorton.  I'm
Merton Thompson with Burns & Levinson.  We're here making a
special appearance to contest personal jurisdiction.  With me
is Keith Jaasma, from Patterson & Sheridan, and my associate,
Diane Noel, from Burns & Levinson.

THE COURT:  Good afternoon to all of you, Mr.
Thompson, Mr. Jaasma, Ms. Noel.

We are here on the plaintiff's motion to amend the
complaint.  And as the Court understands it, having read the
briefs, the main issue is whether this court has personal
jurisdiction over the two principals of the defendant
corporation which has filed a petition in bankruptcy.  And,
actually, the case has been stayed because of that.

And I do appreciate that although the memorandum that

4

 1    was filed on behalf of the defendants said that it was Total

 2    Vein Solutions' opposition to Diomed's motion, I understand the

 3    reasons for the statement just now that you're actually

 4    representing the two individuals whom the plaintiff wishes to

 5    add to the case rather than the corporate defendant, which is

 6    in bankruptcy, and because of which this case has been stayed,

 7    right?

 8            MR. JAASMA:  Your Honor, just if --

 9            THE COURT:  Mr. Jaasma.

02:37 10            MR. JAASMA:  The TBS -- Patterson & Sheridan has been

11    approved as the attorney for TBS for that matter, so we're

12    actually appearing on behalf of TBS and on behalf of the

13    individuals, just to clarify that.

14            THE COURT:  Thank you.  If I didn't make that clear, I

15    should have.

16            What I am going to do is ask each party to address

17    this issue, and perhaps I'll have a few questions for you as we

18    go along.  And at the end, lest I forget, I do want to inquire

19    of the plaintiffs about the related cases that are presently in

02:37 20    this session and what the status of them is.  But we'll get to

21    that at the end.

22            So I'm going to give you no more than 15 minutes, Mr.

23    Albert, to tell me why I should allow your motion to add these

24    individuals who are, as I understand it, corporate officers of

25    a relatively closely-held corporation.  Maybe you can enlighten

1    me.  And I'll let the defendants have at that subject as well.

2    Mr. Albert, you may proceed.

3         MR. ALBERT:  Thank you, your Honor.  One thing I'd

4    like to indicate at the outset is that it's not an issue of

5    veil-piercing that we're here before the Court on.  It is, as

6    your Honor indicated correctly, an issue of personal

7    jurisdiction.  I just wanted to point that out because there is

8    no burden on Diomed to establish the elements of veil-piercing.

9    The question is simply can they assert this claim.  Do they

02:38 10   have the right to amend the pleading under the freely -- under

11   the Rule 15(a) standard of free amendment of pleadings.

12        THE COURT:  As I read the briefs, the defendants don't

13   dispute that, that it's not a piercing-the-corporate-veil case.

14        MR. ALBERT:  That's our reading of it as well, your

15   Honor.

16        So it is well settled that the corporate officers who

17   personally and individually engage in acts of patent

18   infringement, even if they're doing it in their capacity or

19   while employed by their corporation, can be held personally

02:39 20   liable for those acts of patent infringement.

21        The case I'd like, in particular -- I know your Honor

22   has read the briefs.  I would like to direct the Court's

23   attention in particular to the Fromson case, Fromson vs.

24   Citiplate, which is cited in our brief.  And in that case --

25   that was a Federal Circuit ruling.  And the court there held --

6

1    and I'm quoting now -- "The cases are legion holding corporate

2    officers and directors personally liable for participating in,

3    inducing and approving acts of patent infringement."  Then the

4    court in that case went on to find that the officers had

5    "plainly participated in and approved of the infringement of

6    plaintiff's patent."  That is exactly the situation that we

7    have here, and, as in that case, the amendment was allowed.

8         THE COURT:  Okay.  But the real issue here is not

9    whether or not they committed acts of infringement but whether

02:40 10   those acts were sufficiently in contact with this jurisdiction

11   to subject them to the jurisdiction.

12        MR. ALBERT:  Yes, exactly, your Honor.  Let me turn to

13   that now.  That really sets the stage for your Honor's inquiry,

14   which is the defense that they've raised is personal

15   jurisdiction.

16        Now, the problem with their personal jurisdiction

17   defense is that they have based it on the wrong legal standard.

18   In essence, the principles that they have advanced, both the

19   level authority that they've cited and the facts that they

02:40 20   adduce in support of it, would arguably call into question

21   whether there was general personal jurisdiction over them for

22   any cause of action at all in Massachusetts.  In other words,

23   do they have sufficient, sustained, on-going contacts with

24   Massachusetts to be subject to jurisdiction here for any cause

25   of action?  That is not the basis on which we're bringing this

1    claim.

2         The basis on which we're asserting the claim is

3    specific personal jurisdiction.  In other words, as your Honor

4    knows, then the question of whether the contacts that they do

5    have with Massachusetts are, in fact, the very acts that give

6    rise to the claims of patent infringement.  That is precisely

7    what we have here today.  Why that distinction is crucial is

8    because, in a case like this one where the issue is specific

9    jurisdiction, the authority indicates that all you need is one

02:41 10    act.  One sale of an infringing product would be sufficient to

11    subject them to jurisdiction in Massachusetts.  Otherwise, they

12    could effectively evade any responsibility for those acts.

13         The case of Beverly Hills Fan Company vs. Royal

14    Sovereign Corp., which is 21 F.3d 1558, is a Federal Circuit

15    decision in which the Federal Circuit held as follows -- and I

16    quote -- "The defendants argue that their contacts with

17    Virginia were insufficient.  We disagree.  The allegations are

18    that defendants purposefully shipped the accused fan into

19    Virginia through an established distribution channel.  The

02:42 20    cause of action for patent infringement is alleged to arise out

21    of these activities.  No more is usually required to establish

22    specific jurisdiction."

23         In a case that followed that Federal Circuit holding,

24    Osteotech vs. Gensci Regeneration Sciences, which is 6 F.Supp

25    2d 349, that's a District of New Jersey holding.  And that

1    court followed that Federal Circuit ruling and held that a

2    single instance of patent infringement was sufficient to

3    exercise personal jurisdiction over the defendants.

4         THE COURT:  Now I want to hear what the exact act is

5    that you are alleging these individual defendants did that is

6    the equivalent of your case.

7         MR. ALBERT:  Yes, your Honor.  There are a list of --

8    in Exhibit J to our motion is a list of all of the sales that

9    they made or at least all the sales --

02:43 10        THE COURT:  I don't have J with me, but you can

11   enlighten me.

12        MR. ALBERT:  Yes, your Honor.  It's a four-page-long

13   document which has on each page about 5 to 18 lines.  Each line

14   is a sale that they made in Massachusetts.  Now --

15        THE COURT:  When?  And you say "they."

16        MR. ALBERT:  Let me be clear about that then.  The

17   company was founded by these two individuals, Mr. Centanni and

18   Miss Schiek, in 2004.  And they acknowledge that at that time

19   they had no other employees.  They were the only two people who

02:43 20   were committing any acts on behalf of this company at all.

21   Everything they did was them.  That was it.

22        THE COURT:  They are the sole stockholders?

23        MR. ALBERT:  I believe they are currently.  Certainly

24   at the time they were, to the best of my knowledge, the sole

25   stockholders.  But they concede in their deposition testimony

1    that they were the only two people working for the company.  So

2    any act --

3            THE COURT:  From that point until 2006?

4            MR. ALBERT:  Until -- I don't have the precise date,

5    your Honor, but there was a later time when they did start to

6    grow and develop more employees.  At the time that they started

7    out, they were already making sales, in 2004, in Massachusetts,

8    and they were the only ones doing it.  Even since that time --

9    so they clearly engaged in those acts of infringement which in

02:44 10   and of themselves would be enough.

11           Since then their sales have grown and they've added

12   staff, including sales staff, a national sales manager and so

13   forth.  But, interestingly, the testimony from the national

14   sales manager was that she wasn't authorized to make decisions

15   about contacting a customer without the express authorization

16   of the individuals.  So on the test of were they personally

17   engaged in making the sale, yes, at least at the outset they

18   clearly were.

19           THE COURT:  Is it your understanding -- do you have

02:44 20   evidence that the sales were handled by one or both of these

21   individuals?  And by that I mean phone calls or emails were

22   made; contacts were developed with Massachusetts buyers; and

23   that as a result of those conversations that product, if you

24   will, or these packages, packets, were shipped into

25   Massachusetts from Texas.

10

1          MR. ALBERT:  Yes, your Honor.  That's exactly what we

2     have.  We have their own testimony that when they started out

3     there was no one else doing the work.  They individually did it

4     all, including sending the products to Massachusetts, making

5     the contacts, doing whatever it took to run the business.

6          And we have their own document here, Exhibit J --

7     this, I believe, is a summary -- actually, this is from them

8     directly.

9          THE COURT:  Is this the same Exhibit J you just

02:45 10   mentioned?

11          MR. ALBERT:  Yes, your Honor, which lists those sales.

12     There really is no dispute.  They've made these sales.

13          In essence, the argument that they've advanced is the

14     sales in Massachusetts was a relatively small percentage of

15     their business.  That's certainly true.  There's no doubt about

16     it.  But under the specific jurisdiction test, it doesn't

17     matter whether it's a small percentage or a large percentage.

18     What matters is did they sell an infringing product.  Did these

19     individuals sell an infringing product?

02:46 20          THE COURT:  Do you have a dollar volume of the amount

21     of product that they sold into Massachusetts?

22          MR. ALBERT:  If you add up these, I believe the sum is

23     somewhere in the range of $36,000.  It's certainly -- we don't

24     dispute the fact that the percentage is a small one.  But,

25     again, any individual sale at all that they make is sufficient.

1          And, additionally, responding to the issue that I'm

2    sure they will be raising about the fact that more recently

3    than 2004 they now have added sales staff.  And so couldn't it

4    be that some of those individuals were engaged in the sales?

5    Again, as long as we have some sales we have jurisdiction.

6          But even putting that aside, under the <u>Fromson</u> test,

7    the question is not just did they individually make the contact

8    and send the email, but did they participate in and approve of

9    the infringement.  Mr. Centanni and Miss Schiek, as the two

02:46  10    principals of the company, are the ones who direct all of the

11    conduct of anyone else who works there.

12          THE COURT:  So what you're saying is that even if it's

13    subordinates of theirs that actually make the sales that those

14    sales can be attributed to these individuals even if they

15    didn't have a specific direct contact with the sale?

16          MR. ALBERT:  That's actually correct, your Honor.

17          THE COURT:  Do you have any law that says that?  I

18    don't see <u>Fromson</u> as saying that.

19          MR. ALBERT:  Well, your Honor, in <u>Fromson</u> what

02:47  20    happened -- which is somewhat analogous to what happened here

21    -- is the company filed for bankruptcy.

22          THE COURT:  It was after the trial?

23          MR. ALBERT:  Yes, your Honor.  At that point in time

24    an amendment was requested and allowed and affirmed by the

25    Federal Circuit saying that the individual president of the

1    company could be added, not just because of his own individual

2    sales but because of his managerial role in causing those sales

3    to be made.

4        Again, while that is as a matter of law, we believe

5    that the analogy is on all fours with this situation.  We don't

6    even need to fall back on that because we do have individual

7    acts of infringement, as acknowledged by Mr. Centanni and Miss

8    Schiek, going back to when they founded the company in 2004.

9        So from a personal jurisdiction perspective, focusing

02:48 10    on the specific jurisdiction, there is jurisdiction over these

11    two individuals.  The fact that they chose to put the company

12    into Chapter 11 really is what necessitated -- again, this was,

13    of course, a decision by the two principals.

14        They put the company into Chapter 11, as I'm sure your

15    Honor recalls, on the eve of a preliminary injunction hearing.

16    And while it was not Diomed's original intention to seek relief

17    against the individuals, they effectively forced our hand.

18    They deliberately deprived the court of jurisdiction by putting

19    the company into Chapter 11.  They also drained cash out of the

02:48 20    company after having previously represented that it would be

21    solvent and was capable of sustaining a judgment.  They really

22    gave us no choice but to pursue this course of action.

23        THE COURT:  They say your number is wrong.  They

24    didn't take out a million last year.  They really only took out

25    36,000 apiece for the last five years or something like that.

1    I don't have the exact number, but they say your number is way

2    wrong.

3         MR. ALBERT:  Yeah.  I'd love to address that, your

4    Honor.  This is, again, an instance -- and we're seeing more

5    than one piece, unfortunately, where the spin that's being put

6    on it is simply not correct.

7         The numbers are, in fact, in the papers that we filed

8    with your Honor, and we got them from TBS's own bankruptcy

9    file.  They represented to the bankruptcy court that these

02:49 10    numbers were correct.  We attached that filing as Exhibit B to

11    our motion.  On Pages 3 and 4 of that exhibit are the totals of

12    the numbers of the dollar amounts taken out by Miss Schiek and

13    Mr. Centanni.  During the one-year period -- if you add those

14    numbers up, during the one-year period prior to filing, they

15    took out almost exactly a million dollars.  I believe the

16    figure is 985,000 and some change.

17         So what they are saying to your Honor, which may be

18    true, is that, if you look back over five years, the total

19    amount that they each took was only about 850,000, in other

02:50 20    words, collectively, about 1.7 million.  Those two figures are,

21    therefore, not inconsistent.  Both statements could be true.

22    What's interesting about it is that they actually took the vast

23    bulk of that money out, almost a million dollars, which they

24    can't deny, during that last one-year period prior to their

25    bankruptcy filing.

1       So they really forced our hand, and that's why we're

2   here today.  Under the standards for amending pleadings, of

3   course, we don't need to prove that the facts that we've

4   asserted are true.  We certainly don't have any doubt that they

5   are, and, in fact, we have quite a bit of evidence supporting

6   it that we filed with the Court.  But if there is any question

7   or any doubt as to facts, of course, that would be established

8   at a later stage.

9       Really, at the pleading stage, all we're asking for is

02:50 10  the opportunity to assert these claims.  And we believe that

11  under Fromson they're very well supported.  Even without

12  Fromson, Mr. Centanni and Miss Schiek's own individual acts, at

13  the time when they were the only people who ran the company at

14  all and worked for the company, would suffice to support a

15  finding of infringement.

16      THE COURT:  Thank you, Mr. Albert.  Will it be Mr.

17  Jaasma?

18      MR. JAASMA:  Yes, your Honor.  As I think the Court

19  has recognized, Fromson is a case about liability as opposed to

02:51 20  a case about personal jurisdiction.  So the issue here is not

21  whether the acts that they committed could constitute patent

22  infringement.  It's whether they committed enough specific acts

23  targeted at Massachusetts or in Massachusetts that would give

24  the court personal jurisdiction over them.

25      One important thing to remember in comparing this case

1    to the Beverly Hills Fan Corp. case and the other district

2    court case they cited is what the claims at issue in this case

3    are.  And the claims at issue in this case require that lasers

4    and the procedure kits that are used for this process be used

5    in a very specific way.

6         The defendants in this case, the individual defendants

7    in this case, are not doctors.  They don't perform the

8    processes covered by the patent.  They don't instruct people --

9    generally speaking, they don't instruct people how to

02:52 10    perform --

11         THE COURT:  You're saying that the plaintiffs have to

12    prove more than that your individual clients made sales or

13    promoted sales in Massachusetts?

14         MS. JAASMA:  Well, what they're talking about is how

15    one single instance of a sale of the infringing product can

16    give the court jurisdiction over them.  But the point is, is

17    that the sales at issue here were not sales on the infringing

18    products.  What they're saying is the sales at issue here and

19    the other acts of the individual defendants either induced or

02:52 20    contributed to the infringement of these patents.

21         And so what we need -- primarily -- two of their

22    primary arguments about how this infringement was supposedly

23    induced was, one, that these individuals sent out ten

24    videotapes that instructed doctors on how to perform a process

25    that they claim is infringing.  None of these ten videotapes

1    were sent to Massachusetts.

2            THE COURT:  Wait a minute.  Maybe I'm missing

3    something.  I thought Mr. Albert was just telling me about

4    actual sales in the year 2004.

5            MR. JAASMA:  Right.

6            THE COURT:  And he says the only -- your two clients

7    were the only two employees of the defendant corporation.

8            MR. JAASMA:  Right.  And the sales that they say were

9    infringing or that induced infringement were the sales of both

02:53 10   these procedure packs and these lasers -- the fiberoptic laser

11   -- by our clients.  Our clients sell both of these but they

12   sell them separately.

13           If you look at, again, Exhibit J, which they pointed

14   to you, their exhibit -- I know the Court doesn't have it in

15   front of him.  But in Exhibit J many of the sales that they say

16   give them specific jurisdiction were of only one or the other

17   of these things that they accuse of infringing because they are

18   both sold by my clients.  You have the process -- the procedure

19   packs and you have the laser fibers.  And in some cases some of

02:54 20   the people they say they were sold to, they only bought the

21   laser fiber.  In some cases they only bought the procedure

22   packs.  In some cases the customers bought both at the same

23   time, but in other cases the same customers would only buy one

24   or only buy the other.

25           These are the acts that they're saying give rise to

1    the infringement.  But unlike the cases it sounds like he's

2    cited -- we haven't seen them; they didn't put them in a reply

3    brief or anything -- those cases were -- apparently, they were

4    relying on the direct sale of the infringing product.  In this

5    case it's not a direct sale of the infringing product that --

6           THE COURT:  Maybe I'm not understanding, Mr. Jaasma.

7    Are you saying that your two individual clients did not make

8    the sales in 2004 that Mr. Albert says they made?

9           MR. JAASMA:  That's also another thing.  He cited to

02:54 10  supposed deposition testimony of both of the individuals who

11   supposedly confirmed that they were the only employees in 2004

12   and 2005.  I'm not aware of that testimony.  If there is such

13   testimony, it wasn't attached to their brief.  What they relied

14   on was a single interrogatory answer that identified Miss

15   Schiek, one of the defendants, as having had knowledge of sales

16   and been involved in sales.

17          THE COURT:  Did they have more employees in 2004?

18          MR. JAASMA:  It's my understanding from talking to the

19   individuals that they did.  They had -- initially, when they

02:55 20  started the company, what they had was an answering service

21   which essentially -- it was a very small company when they

22   began.  Mr. Centanni actually worked for a different company at

23   the time and was doing this on the side.

24          Initially, they had an answering service which would

25   take in orders.  Then they would be processed by Miss Schiek

1    and perhaps by other individuals who were employed by the

2    company.  So it's possible -- I can't tell the Court that it's

3    impossible.

4            THE COURT:  How many employees do they have now?

5            MR. JAASMA:  Six or seven, around that number.

6            THE COURT:  And it's a closely-held corporation.  Are

7    there any other stockholders other than the two individual

8    defendants?

9            MR. JAASMA:  I don't believe so, your Honor.

02:55 10         THE COURT:  They're the directors as well?

11           MR. JAASMA:  That's correct.  They're the two owners

12   of the LLC.

13           THE COURT:  Is it your position that the actions of

14   their subordinates could not be attributed to them?  In other

15   words, if Miss -- I've got the names probably wrong here.  I

16   don't have them in -- Miss Schiek, if she were, for example, to

17   have said to the only other employee that they might have had

18   in 2004, now, I want you to make calls, not necessarily

19   directed at Massachusetts but I want you to make calls, and

02:56 20  among those calls that subordinate made one to Massachusetts.

21   Could that act be attributed to Miss Schiek, or are you telling

22   me that because there was a distance between the actor and the

23   conduct that Miss Schiek can't be held to personal jurisdiction

24   in Massachusetts?

25           MR. JAASMA:  That would not be sufficient.  It's our

1    position that would not be sufficient for personal

2    jurisdiction, your Honor.  If she had said, you know what?  Our

3    sales are kind of slow in Massachusetts.  We really need to

4    target Massachusetts.  Why don't you guys go out and start

5    calling Massachusetts.  It's possible that could be enough.

6    Generally speaking, this company doesn't make sales calls.  It

7    gets calls in from people as a result of mailings or

8    advertisements or conferences or things like that, none of the

9    conferences being in Massachusetts.  To the extent it does

02:57 10    return calls to customers or calls customers, there's no

11    specific targeting of Massachusetts and no intent on behalf of

12    the individuals --

13         THE COURT:  Let me ask you a different question.  Does

14    the defendant agree that because the corporate defendant filed

15    for bankruptcy that the analysis with respect to allowing a

16    motion to add these individuals has changed?

17         MR. JAASMA:  I don't think so, your Honor, I mean,

18    because the inquiry for personal jurisdiction would still be

19    the same, so that part I do not think has changed.

02:57 20         THE COURT:  Well, let's take the question of personal

21    jurisdiction out of it.  Say that wasn't an issue, like in

22    Fromson.

23         MR. JAASMA:  Right.

24         THE COURT:  Does the fact that the original defendant,

25    who was a corporation, goes into bankruptcy change the analysis

1    by which the court is to determine whether the individuals, as

2    opposed to the corporation, should be named as parties?

3         MR. JAASMA:  I don't recall the specifics of Fromson,

4    your Honor.  It's possible that it does but I don't know, your

5    Honor.

6         One thing I should point out is that Diomed is also in

7    bankruptcy.  If you get to the considerations -- we don't think

8    there are the minimum contacts that are required.  Beyond the

9    minimum contacts, the Court needs to consider due process.

02:58 10   Some of the due process considerations are whether there can be

11   an efficient resolution of this if it's in two different

12   jurisdictions.

13        One thing to keep in mind is that Diomed is also in

14   bankruptcy now.  If these issues were to be considered both

15   here and in the bankruptcy court in Houston, we're talking

16   about two courts that are in bankruptcy here.  Not only the

17   resources of the court would be wasted by having two different

18   procedures going on but --

19        THE COURT:  How does their bankruptcy affect --

02:59 20   they're either in this district court or they're in a

21   bankruptcy court here, but they're not in both at the same

22   time.

23        MR. JAASMA:  Right.  One thing it affects is -- you've

24   got a company that's in bankruptcy, and if you have parallel

25   proceedings going on, unnecessary parallel proceedings going

1    on, then that's going to further diminish their assets as

2    opposed to if these issues are decided --

3        THE COURT:  I see.  You're suggesting that for the

4    benefit of the creditors of Diomed that I ought not to allow

5    personal jurisdiction over your client?

6        MR. JAASMA:  That is one consideration as part of the

7    due process and reasonableness inquiry, is just the efficient

8    resolution of -- it's just one consideration, your Honor.

9        THE COURT:  Given the corporate structure of your

03:00 10    corporate client, how is it possible that this court has

11    jurisdiction over the corporation but not the individuals?

12        MR. JAASMA:  As he indicated, it can be a situation in

13    which one sale -- in this case in behalf of the corporation --

14    could be enough to give personal jurisdiction over the

15    corporation.  But if the individuals who are in charge of the

16    corporation aren't personally directing their activities at

17    Massachusetts or personally participating in those sales to

18    Massachusetts, then there wouldn't be personal jurisdiction

19    over the individuals.  If they've got subordinates who are

03:00 20    involved in receiving those phone calls and having -- and

21    shipping out those orders to Massachusetts, then there wouldn't

22    be personal jurisdiction over the principals or there would be

23    over the corporation.

24        THE COURT:  Is it necessary for anybody over which I

25    exercise jurisdiction to specifically target Massachusetts with

1    its advertising or its sales, or is it enough that the -- that

2    marketing and the sales go generally out, like, over the

3    internet or at a trade show that is targeted toward people that

4    come from all over the country?  Does there need to be a

5    specific target to this jurisdiction or is that not necessary?

6            MR. JAASMA:  With a sufficient number of sales, there

7    probably wouldn't be required to be the targeting.

8            It's interesting that you mention the internet cases.

9    There are a bunch of cases on that, where the court says, just

03:01  10  because there's an internet website out there that's accessible

11   by people from Massachusetts and they make orders through that

12   website, that alone isn't enough to find personal jurisdiction

13   over those individuals.

14           So if there were sufficient amount of sales, yes, that

15   could be enough.  In this case, where less than one percent of

16   the sales are to residents of Massachusetts and even a small

17   percentage of those involve the sales of both the laser fibers

18   and the process packs that they accuse of inducing infringement

19   that -- we would say that in that case there would have to be a

03:02  20  specific targeting of Massachusetts for that to be sufficient.

21           THE COURT:  Doesn't the advertising kind of package

22   them together and say you don't have to buy them all, but if

23   you buy them all, you get a lower price?

24           MR. JAASMA:  No, it didn't do that.  In one instance I

25   believe what it did is it advertised the two or three of them

1    together and said, This is our price.  Essentially compare this

2    price to the competitors.  I don't believe it was a lower price

3    for buying them together, but it was a -- this is how much

4    these would cost you if you bought them together.

5         THE COURT:  All right.  Thank you, counsel.  Did you

6    wish a one-minute rebuttal, Mr. Albert?

7         MR. ALBERT:  Not unless the Court has any questions.

8         THE COURT:  I don't need one.  I do want, as I

9    mentioned before, to find out from you with respect to the

03:02 10   other cases that have been filed.  There basically have been

11   five cases filed on behalf of Diomed in this court and assigned

12   to this session.  Of course, two of those had to do with the

13   matter that was tried back in 2007.

14        But there is also a case, the New Star Lasers case,

15   which is 04-12157, filed in October of 2004, which was

16   partially stayed back in 2005 to allow the Court to determine

17   the claim construction in the first case.  And Judge Stearns

18   issued a scheduling order back in February of 2005, but no

19   activity has occurred since Judge Stearns recused himself.

03:03 20   What's the status on that case?

21        MR. ALBERT:  On the New Star Lasers case?

22        THE COURT:  Yes.

23        MR. ALBERT:  And they're known as CoolTouch, so I

24   sometimes refer to them as CoolTouch.

25        There has been, in fact just recently, a reopening of

1    settlement negotiations between the parties on that case.  So

2    we are hopeful that progress will be made.  I can't say a lot

3    more because we haven't had those -- finalized those

4    discussions yet.

5        THE COURT:  I don't want this to drop off into a black

6    hole somewhere, and it is now, of course, an almost

7    four-year-old case.  And you may or may not know, I don't like

8    to have cases that are on my three -- so-called three-year

9    list, which this will be.

03:04 10        I'm going to need a joint status statement.  As an

11    officer of the court, you can inform the defendants that I

12    would like a joint status report on that case filed, let's say,

13    within a month.

14        MR. ALBERT:  Yes, your Honor.

15        THE COURT:  Then there is also the case against

16    Dornier MedTech, which is 07-10612, which was filed in March of

17    2007 and has had no activity other than the filing of a

18    complaint and an answer to the counterclaim.  What is the

19    status of that case?

03:04 20        MR. ALBERT:  I really don't have anything to report on

21    the status of that since, as was alluded to earlier, Diomed

22    went into its own Chapter 11 proceedings.  There was a lull in

23    activity.  It's now -- we have been appointed as special

24    counsel to handle all outstanding matters.  That's why the

25    CoolTouch case has been moving forward.  I can't report that

1    the Dornier case is moving forward because nothing has really

2    happened.  If the Court would like to have a joint status

3    report on that --

4         THE COURT:  I would.  I would like that on that case

5    as well within a month.

6         Does that cover all of the cases that are currently

7    outstanding?

8         MR. ALBERT:  The two that were tried had gone up on

9    appeal but those appeals were dismissed, so those are now over.

03:05 10    So I believe other than them and TBS that's it.

11         THE COURT:  Thank you, counsel.  I will take the

12    matter under advisement.

13    (Whereupon, at 3:07 p.m. the hearing concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4              I, Cheryl Dahlstrom, RMR, and Official Reporter of the

5    United States District Court, do hereby certify that the

6    foregoing transcript, from Page 1 to Page 25, constitutes, to

7    the best of my skill and ability, a true and accurate

8    transcription of my stenotype notes taken in the matter of

9    Civil Action NO. 04-10686, Diomed, Inc. vs. Total Vein

10   Solutions, LLC.

11

12

13

14

15

16                             /s/ Cheryl Dahlstrom
                             _____

17                             Cheryl Dahlstrom, RMR

18                             Official Court Reporter

19

20

21

22

23

24

25